## In the United States District Court
## for the District of Kansas

————————

Case No. 2:19-cv-02725-TC

————————

WILLIAM DONAHUE,

*Plaintiff*

v.

UNITED PARCEL SERVICE, INC.,

*Defendant*

————————

## MEMORANDUM AND ORDER

William Donahue filed this action against his former employer, United Parcel Service, Inc., alleging that UPS violated state and federal antidiscrimination laws. Doc. 62. UPS moved for summary judgment on all claims. Doc. 63. For the following reasons, UPS's Motion for Summary Judgment is granted in part and denied in part.

## I

## A

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim's resolution. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over those material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine issue of fact exists, the Court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1138 (10th Cir. 2011); *see also Allen v. Muskogee,* 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record as a whole, *see Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

## B

**1.** UPS provides national freight and transportation services and maintains a customer center in Kansas City, Kansas. Doc. 62 at ¶ 2.a. UPS hired Donahue, who is African-American, in May 2018 to be a full-time package car driver at that customer center. Doc. 64 at 5; Doc. 62 at 2.[1] New UPS employees are placed in a thirty-day probationary status until they qualify for seniority under a collective bargaining agreement. Doc. 67 at 2–3. Donahue was an at-will employee during the entirety of his time with UPS. Doc. 62 at 2.

As an at-will, probationary employee, Donahue faced a rigorous training program before he could become a full-fledged driver under the collective bargaining agreement. Doc. 68 at 38–39. Trainee drivers spend their first week in the classroom learning UPS rules, procedures, and techniques. Doc. 67 at 4. After the classroom, they enter the hands-on portion of the program, referred to as the "training packet."

---

[1] All references to the parties' briefs are to the page numbers assigned by CM/ECF.

*Id.* Generally, trainees have 30 working days in which to complete the training. *Id.* at 5. During that period, UPS contends trainees must "run scratch"—meaning they must deliver 100 percent of a package car driver's daily load—for five days in a row. Doc. 68 at 40.

There is a dispute about whether there is really an obligation to run scratch five days in a row. Donahue points out that the requirement for probationary package car drivers to run scratch within 30 days does not appear anywhere in the collective bargaining agreement and that UPS has made exceptions to this requirement for others. Doc. 68 at ¶¶ 163–65 (failing to controvert Donahue's statement that the "only requirement contained in the CBA for probationary package car drivers was to work thirty (30) working days within ninety (90) calendar days"). As Mike Bayers, Donahue's direct supervisor, testified, "[W]e've made exceptions, like if you have one caught issue that was out of your control there was a couple times we'd make an exception, but, typically, you had to hit five days." *Id.*

UPS alleges that, given Donahue's performance early in his training, its managers developed concerns about whether he would be able to qualify within the 30-day probationary period. Doc. 64 at 7; Doc. 64-8 at 3. According to UPS, those concerns were validated. Donahue failed to deliver his packages in a timely manner and failed to run scratch at any point during his probationary period. Doc. 64 at 7. Further, Donahue's managers had discussed amongst themselves his performance prior to the last week of the training packet, and worried that Donahue "was on the fence [and] that he was at risk before that week [of June 28, 2018] even started." Doc. 64-2 at 11 (Dep. of Bayers). Their concern was that Donahue would not be able to complete the five consecutive days of successful package delivery within the probationary period and that UPS would likely terminate his employment if Donahue's performance did not improve. Doc. 64 at 7.

Meanwhile, Donahue believed he "was on the correct course" and that he would eventually qualify, based on discussions with his supervisors. Doc. 69-1 at 168 (Dep. of Donahue). Donahue asserts that several of his supervisors and mentors told him that he was doing a good job. *Id.* at 167–68. Donahue's training forms suggest that he was improving. For example, he was marked as proficient in several categories. *See* Doc. 64-2 at 40–46.

**2.** The events that led to this litigation began on June 28, 2018. Doc. 62 at 3. This was Donahue's sixteenth workday of his

probationary period. Doc. 68 at 10. At that time, Kelley Ceesay was the center manager for the UPS facility where Donahue worked, Doc. 62 at 3, and Mike Bayers was Donahue's direct supervisor, *id.* at 2. But on June 28, Jonathan Fisher was Donahue's acting supervisor, because Ceesay was out on vacation. Doc. 67 at 14. All of these employees are white. Doc. 62 at 2–3.

June 28 was a hot day. The temperature in Kansas City hit 102 degrees Fahrenheit, with a heat index of 114 degrees. Doc. 62 at 3. While working his package route, Donahue began feeling the effects of heat stress: dizziness, light-headedness, shallow breathing, and low energy. Doc. 67 at 10; Doc. 68 at 10. At some point, Donahue passed out, fell, and injured his knee. Doc. 67 at 11–12; Doc. 68 at 10. After resting in the shade at a residence on his delivery route and drinking some water, Doc. 67 at 11, Donahue returned to the UPS customer center without delivering all of his packages, Doc. 67 at 13; Doc. 68 at 10. There, he vomited outside of his package car. Doc. 68 at 10.

Events unfolded quickly from there. Donahue was seen in the UPS "check-in room sitting on a cart" for about 20 minutes and at least two employees interacted with him. Doc. 67-5 at 15 (Dep. of Burger). A collection supervisor gave Donahue a wet towel. Doc. 68 at 11–12. In addition, a union steward, Larry Burger, saw Donahue and tried to discuss what had happened. *Id.* at 12. Burger noted that Donahue looked "about dead" and "very ill." *Id.* at 13.

Despite this, Donahue's supervisor was more concerned with the remaining contents of his delivery vehicle. Fisher inspected Donahue's package car and found that he had not delivered all of his assigned packages. Doc. 68 at 14. Fisher also reviewed the vehicle's on-board computer system to determine why there were undelivered packages. Doc. 67-6 at 11 (Dep. of Fisher). Seeing no communication explaining his failure to deliver all the packages, Fisher believed that Donahue had "turfed" packages—UPS slang for inexcusably failing to deliver all of his assigned packages. Doc. 68 at 15, 19, 21; Doc. 67-6 at 20. Fisher considers a driver turfing packages to be an integrity issue that warrants termination. Doc. 68 at 19–20. Fisher informed Bayers, Donahue's regular supervisor, that Donahue had turfed packages and that Fisher therefore intended to terminate Donahue. Doc. 64 at 8. Bayers agreed with Fisher's decision. *Id.*

Though Donahue still felt ill, Fisher brought Donahue and Burger into his office. Doc. 64 at 9; Doc. 67 at 21. In that meeting, Fisher told

4

Donahue that he was being terminated for turfing packages. Doc. 64 at 9. Fisher then briefly left the office to obtain the necessary paperwork. *Id.* When Fisher returned, Burger said that Donahue was suffering from a heat-related injury and needed immediate medical attention. Doc. 67 at 21. Although the parties dispute exactly when Fisher first learned of Donahue's heat-related illness, the undisputed facts show that Burger raised the issue before Fisher completed the termination paperwork. Doc. 64 at 9. Nonetheless, Fisher proceeded. He took Donahue's badge and had him escorted off the premises. Doc. 68 at 19.

But Donahue was still unwell, and while he was leaving, a security guard stopped him and made him sit in the air-conditioned booth due to his apparent condition. *Id.* Eventually, Donahue left. He briefly returned home before going to an emergency room, where he was admitted for heat exhaustion and diagnosed with a broken kneecap. Doc. 64 at 9.

**3.** The next day, UPS changed course. A UPS health and safety supervisor, Julia Lewis, visited Donahue in the hospital. Doc. 62 at 3; Doc. 64 at 9. She told Donahue that, contrary to Fisher's statements, his employment was not terminated and that he should focus on his health, with the expectation that he could return to UPS after he recovered. Doc. 67 at 24. In addition, Bayers called Donahue at the hospital to check on him. *Id.* at 25.

Consistent with her statements, Lewis entered Donahue's injury into UPS's injury-reporting system and initiated a workers' compensation claim. Doc. 64 at 9; Doc. 67 at 25. Donahue remained on workers' compensation leave until October 12, 2018. Doc. 67 at 26. During that period, Donahue recovered and remained on the UPS payroll while receiving workers' compensation benefits. Doc. 67 at 53. By early that October, Donahue was medically cleared and released to work without restrictions. Doc. 62 at 4.

Following that clearance, Ceesay, the UPS facility manager, invited Donahue into the office to meet with her and Bayers, his supervisor, about a return-to-work plan. Doc. 68 at 31. At that meeting, Ceesay gave Donahue two options. He could pick up where he left off in his training program and try to "run scratch" five days in a row within the remaining 13 or 14 days of his probationary period. *Id.* at 32–33, 39. Or he could reapply for his position and start a new probationary period with a full 30 days to complete it. Doc. 67 at 28. Although he was medically cleared, Donahue thought he needed some more time to get

back into shape to perform the physically demanding job. Doc. 64-1 at 32–33. He also believed there was little chance of him picking up where he left off and successfully qualifying after being off of work due to injury. *Id.* Bayers agreed, saying it would be nearly impossible for Donahue to run scratch five days in a row within his remaining 13 or 14 days. *Id.* The second option was for Donahue to reapply for his position and re-start his probationary period with a full 30 days to complete it. Doc. 67 at 28. Ceesay offered to assist Donahue with HR to restart the application process. Doc. 68 at 33.

Donahue did not like these options and rejected both. Doc. 64 at 10. According to Donahue, UPS then terminated him. *Id.* UPS, on the other hand, considered it an administrative separation since Donahue, as a new hire, had no original position within the company to which he could return. Doc. 67 at 30. Donahue asserts that neither option was viable and that UPS had already determined—before the meeting—to fire him. *Id.* at 29.

UPS later settled Donahue's workers' compensation claim. Doc. 68 at 38; Doc. 67-18 at 1. As part of that settlement, Donahue received a permanent disability rating of 2.5 percent for the heat exhaustion/kidney injury and a 10 percent permanent impairment of function for his lower left leg. *Id.*

**4.** Donahue subsequently filed a Charge of Discrimination against UPS with the Kansas Human Rights Commission and the EEOC. Doc. 1 at 2; Doc. 1-1 at 2. The EEOC issued Donahue a Notice of Right to Sue, Doc. 1 at 3, and he filed this suit.

Donahue asserts five claims. Doc. 62 at ¶ 4.a. In Count I, he alleges that UPS subjected him to retaliatory discharge in violation of the Kansas Workers Compensation Act (KWCA), K.S.A. 44-501. Doc. 62 at ¶ 4.a.1. In Counts II through IV, he alleges that UPS failed to accommodate his disability and discriminated against him in violation of the Americans with Disabilities Act, as amended (ADAAA), 42 U.S.C. § 12101 *et seq.*, and that it retaliated against him for engaging in protected conduct in violation of the ADAAA and the Kansas Act Against Discrimination (KAAD), K.S.A. 44-1001. Doc. 62 at ¶ 4.a.2–4. He also alleges in Count V that UPS discriminated and retaliated against him because of his race in violation of 42 U.S.C. § 1981. Doc. 62 at ¶ 4.a.5. UPS moved for summary judgment on all claims. Doc. 63.

## II

UPS's motion for summary judgment is granted in part and denied in part. The motion is denied for Donahue's retaliatory discharge and disability claims because Donahue has created a genuine dispute of material fact. But for Donahue's race-related claims, UPS has established that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law.

## A

In Count I, Donahue contends that he was discharged in retaliation for pursuing remedies under the KWCA. Doc. 62 at ¶ 4.a.1. UPS argues that it did not actually terminate Donahue. Doc. 64 at 16–17. This claim survives summary judgment because Donahue has created a genuine dispute of material fact as to whether UPS terminated him.

Kansas appellate courts apply a burden-shifting analysis when analyzing KWCA retaliation claims. The plaintiff must first establish a prima facie case of retaliation. This requires proof that he or she filed a claim for workers' compensation benefits or sustained an injury for which he or she might assert a claim for benefits; that his or her employer had knowledge of the plaintiff's workers compensation claim or injury; that the employer terminated the plaintiff's employment; and that there exists a causal connection between the claim or injury and the termination. *Gonzalez-Centeno v. N. Cent. Kan. Reg'l Juv. Det. Facility*, 101 P.3d 1170, 1177 (Kan. 2004). If a plaintiff makes this prima facie case, then the burden shifts to the employer to "articulate a legitimate, nonretaliatory reason for terminating the employee." *Id.* If the employer meets that burden, then the employee must show by a preponderance of the evidence that the employer's reasons were pretextual. *Id.*

UPS's sole argument on summary judgment is that Donahue cannot establish a prima facie case because UPS did not terminate Donahue. Doc. 64 at 20–21. According to UPS, Fisher's June 28 conduct—issuing Donahue a discharge notice, taking his employee access badge, and escorting him out of the building—was ineffective because Lewis subsequently informed Donahue that he was not terminated and reinstated him in the payroll system. *Id.* As for the October 2018 meeting with Ceesay, UPS argues that it also was not a termination because UPS provided Donahue with two return-to-work options, which he rejected. UPS took this rejection as a voluntary resignation. *Id.*

Viewed in the light most favorable to Donahue, a reasonable jury could find that UPS terminated Donahue's employment in either June or October. For the June termination, while there is no dispute that Lewis told Donahue that he was not fired, there is no documentation formally rescinding Fisher's termination paperwork, and it appears that his employee badge was not returned. Doc. 67 at 65; Doc. 68 at ¶ 63. Moreover, it is unclear whether Lewis even had the authority to rescind the termination, as she was not Donahue's supervisor, did not outrank Ceesay, and would not typically be involved in a personnel matter concerning an employee's status. Doc. 68 at ¶¶ 194–95. It must be left to a jury to assess the parties' credibility and weigh their conflicting evidence on this issue.

The same is true regarding the October meeting. Donahue essentially claims that he was constructively discharged when UPS chose to present two nonviable options that it knew or should have known that Donahue would not accept. Doc. 67 at 66, 74–75. "Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1318 (10th Cir. 2017) (brackets and internal quotation marks omitted); *see also Garvey Elevators, Inc. v. Kan. Hum. Rts. Comm'n*, 961 P.2d 696, 703 (Kan. 1998). For Donahue, he "must show that he had 'no other choice but to quit.'" *Yearous v. Niobrara Cnty. Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997) (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir. 1992)). This is an objective standard: it is up to the trier of fact to determine whether working conditions are so "difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 n.3 (10th Cir. 1986) (quoting *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 65 (5th Cir. 1980)).

It is possible that a reasonable jury may conclude that Donahue had no option but to quit. The two options that Ceesay provided to Donahue were to reapply for a trainee position with no guarantee that he would be rehired, or to attempt to complete training within two weeks after being out of commission for over three months. The two options could be construed as difficult, if not impossible. *See Derr*, 796 F.2d at 344. Bayers even admitted that the likelihood of Donahue successfully completing the training period where he left off was low. Doc. 64-1 at 32–33. Furthermore, Donahue points to a handwritten note that Ceesay made indicating UPS was terminating him and that

8

Donahue did not resign. Doc. 64-1 at 46; Doc. 67 at 66. That is suffi-
cient for Donahue to present his view to a jury.

Finally, UPS contends that it is entitled to summary judgment be-
cause the Tenth Circuit, in *Orr v. City of Albuquerque*, 417 F.3d 1144,
1150 n.7 (10th Cir. 2005), recognized that a negative personnel action
is not an adverse employment decision if it is rescinded before the em-
ployee suffers tangible harm. But that decision is inapposite here. For
one thing, there is a dispute of fact about whether UPS effectively re-
scinded the termination. There is colorable evidence to suggest it did
not. For another, even assuming that UPS did rescind the June termi-
nation, Donahue could still proceed to trial on the October 2018 en-
counter.

## B

In Counts II, III, and IV, Donahue contends that he was denied
an accommodation and discriminated against in violation of the
ADAAA (Counts II and III), and that UPS retaliated against him for
engaging in protected conduct contrary to the ADAAA and KAAD
(Count IV). Doc. 62 at ¶ 4.a.2–4. He relies on circumstantial—not di-
rect—evidence. As a result, all but one are evaluated under the familiar
*McDonnell Douglas* burden-shifting regime: the plaintiff must produce
evidence to satisfy the claim's prima facie case; if he or she does so the
burden shifts to the defendant to identify a legitimate, non-discrimina-
tory basis for the action; and, if that occurs, the burden returns to the
plaintiff to offer evidence indicative that the proffered reason was
mere pretext. *See, e.g., Aubrey v. Koppes*, 975 F.3d 995, 1015 (10th Cir.
2020); *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018);
*Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015);
*Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 & n.3 (10th Cir. 1997) (an-
alyzing plaintiff's KAAD claims under *McDonnell Douglas* framework).

The prima facie elements for the discrimination and retaliation
claims are similar. For a prima facie ADAAA discrimination claim, Do-
nahue must demonstrate that he had a disability within the meaning of
the ADAAA, is qualified for the position that he held or desired, and
that he was discriminated against on the basis of his disability. *Lincoln*,
900 F.3d at 1192 (quoting *Kilcrease v. Domenico Transp. Co.*, 828 F.3d
1214, 1218–19 (10th Cir. 2016)). To state a prima facie ADAAA and
KAAD retaliation claim, Donahue must demonstrate that he engaged
in protected opposition to discrimination, a reasonable person would
have found the challenged action to be materially adverse, and a causal

connection exists between the protected activity and the materially adverse action. *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1265 (10th Cir. 2009) (ADA); *see Hutchings v. Kuebler*, 5 F. Supp. 2d 1186, 1197 (D. Kan. 1998) (KAAD).

Unlike the aforementioned discrimination claims, Donahue's failure to accommodate claim requires a different analysis because it "require[s] no evidence of discriminatory intent in any form." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1049 (10th Cir. 2017). Instead, the Tenth Circuit applies a modified burden-shifting framework to "determine whether the various parties have advanced sufficient evidence to meet their respective traditional burdens to prove or disprove the reasonableness of the accommodations offered or not offered." *Id.* at 1050 (quoting *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1178 n.12 (10th Cir. 1999)). Under this modified framework, Donahue must make a prima facie showing that he had a disability as the ADAAA defines that term, was otherwise qualified to perform the position, and requested a plausibly reasonable accommodation, but that UPS refused to accommodate his disability. *Aubrey*, 975 F.3d at 1005; *see also Punt*, 862 F.3d at 1050. If Donahue can establish a prima facie case, then the burden shifts to UPS to provide evidence that either conclusively rebuts one or more elements of his prima facie case or establishes an affirmative defense. *Aubrey*, 975 F.3d at 1005 (citing *Lincoln*, 900 F.3d at 1204).

These applicable standards frame UPS's three summary judgment arguments. First, it argues that Donahue was not disabled as contemplated by the ADAAA because his injuries were temporary. Doc. 64 at 17. Second, it argues that Donahue was not a qualified individual because he was a probationary package car driver who was unable to complete his delivery route in a timely manner. *Id.* at 17–18. Third, it asserts that Donahue's proposed accommodation—that he remain at UPS without having to satisfy the training requirements—was unreasonable. *Id.* at 16–18. That motion is denied because UPS has failed to establish the absence of a dispute of genuine fact and entitlement to judgment as a matter of law.

**1.** UPS's argument that Donahue does not have a disability because his condition was temporary is inconsistent with the ADAAA's expanded definition of disability. Under that amended definition, "[t]he term 'disability' means, with respect to an individual (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . .'" 42 U.S.C.

10

§ 12102(1); *see also Skerce v. Torgeson Elec. Co.*, 852 Fed. App'x 357, 362 (10th Cir. 2021) (applying the amended definition). That definition does not affirmatively require permanence, and EEOC regulations address any ambiguity by stating that "impairment[s] lasting or expected to last fewer than six months can be substantially limiting" for the purposes of proving an actual disability. 29 C.F.R. § 1630.2(j)(1)(ix); *see also Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 329 (4th Cir. 2014). Those same regulations counsel that the term "substantially limits" should be "construed broadly in favor of expansive coverage" and should not be viewed as a "demanding standard." 29 C.F.R. § 1630.2(j)(1)(i) (2013). Finally, the Tenth Circuit has held that subsection (A)'s "substantial limitation" element is a question of fact for the jury. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 545 (10th Cir. 2014).

Thus, even temporary injuries can constitute disabilities for purposes of the ADAAA, and there is a genuine dispute as to whether Donahue's injuries qualify as such a disability. It is no answer to suggest that Donahue was fully recovered and released to work. *Contra* Doc. 64 at 17; Doc. 64-1 at 45. Donahue provided evidence that he was later awarded a permanent disability rating for both the heat exhaustion and kidney injury (2.5%) and impairment to his leg (10%), creating the inference that he was still impaired at the time he was terminated. Doc. 68 at 38. Therefore, a genuine dispute of material fact exists as to whether Donahue was impaired at the time of his meeting with Ceesay and Bayers in October 2018 to such an extent as to substantially limit his ability to work.[2] *See Smothers*, 740 F.3d at 545; *see also Hawkins*, 778 F.3d at 883. Donahue has raised sufficient dispute as to make it a question for the jury to decide whether he was disabled under § 12102(1)(A).

**2.** UPS's next argument for summary judgment is that Donahue cannot be considered a qualified individual as that term is used in the ADAAA because he was a probationary—not a qualified, full-time—employee. Doc. 64 at 17–18. The ADAAA forbids a covered employer from discriminating against a "qualified individual" on the basis of his or her disability. 42 U.S.C. § 12112(a). A "qualified individual," in turn, is defined as a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that [he] holds or desires." *Hawkins*, 778 F.3d at 884. Essential functions are those "fundamental job duties of the employment position

---

[2] "Working" is considered a "major life activity." 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(i).

the individual with a disability holds or desires." *Adair v. City of Mus-kogee*, 823 F.3d 1297, 1307 (10th Cir. 2016) (quoting 29 C.F.R. § 1630.2(n)(1)(2015)). The employer receives a level of deference as to what functions are essential and the employer's written job description is considered evidence of the essential functions of the job. *Hawkins*, 778 F.3d at 884.

UPS's argument fails. For one thing, it identifies no legal authority for the proposition that a probationary employee cannot be qualified under the ADAAA simply because they have not yet matriculated from their probationary status. *See Phillips v. Calhoun*, 956 F.2d 949, 953–54 (10th Cir. 1992) (noting that a litigant must support a contention with pertinent legal authority). But more importantly, UPS's focus is off. It's argument is focused on establishing that Donahue had not yet satisfied the steps necessary to become a full-time driver. The critical inquiry, however, is whether Donahue can establish that he was a "qualified individual" as that term is used in the ADAAA. 42 U.S.C. § 12111(8). On that issue, UPS has failed to establish there is no genuine dispute of material fact about whether Donahue would have been able to per-form all of the job functions with or without an accommodation. In-deed, the record evidence shows that his probationary status had not yet expired, that the five-days-scratch rule may not have been a rule after all, and that, in any event, Donahue sought an accommodation from it in light of his on-the-job injury.

**3.** Finally, UPS claims that it is entitled to summary judgment on Donahue's failure-to-accommodate claim because he either failed to meaningfully engage in the interactive accommodation-request process or his proposed accommodation was unreasonable. Doc. 64 at 18–20. This argument fails too because Donahue can demonstrate that there is a dispute as to whether he engaged in the process and whether he requested an accommodation that was reasonable under the circum-stances. Importantly, in the failure-to-accommodate context, "[e]stab-lishing a prima facie claim is not onerous." *Aubrey*, 975 F.3d at 1005 (citing *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015)).

The ADAAA imposes on covered employers an obligation to pro-vide reasonable accommodations to qualified persons who have disa-bilities. *See Smith*, 180 F.3d at 1169. A reasonable accommodation "re-fers to those accommodations which presently, or in the near future, enable the employee to perform the essential functions of his job." *Aubrey*, 975 F.3d at 1007 (quoting *Lincoln*, 900 F.3d at 1205). These

may include "job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position." *Id.* (quoting 42 U.S.C. § 12111(9)). Additional time to re-acclimate to a work position can constitute a reasonable accommodation. *See Robert v. Bd. of Cnty. Comm'rs of Brown Cnty.*, 691 F.3d 1211, 1218 (10th Cir. 2012) ("[B]rief leave[s] of absence for medical treatment or recovery can be a reasonable accommodation.").

The ADAAA necessarily requires the employer and employee to meaningfully engage with one another to reach a reasonable accommodation. *See Smith*, 180 F.3d at 1171–72 (quoting *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998)). The employee is not required to use magic words such as "reasonable accommodation" or the like, *id.*, but must "convey to the employer a desire to remain with the company despite his or her disability and limitations," *id.* (citing *Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142 (3d Cir. 1999)). Once an employee gives appropriate notice of a request for an accommodation, the employer's responsibilities under the interactive process begin, and both parties must proceed in a "reasonably interactive manner" to see if the employee would be qualified—with or without reasonable accommodations—for the position or a similar position within the company. *Smith*, 180 F.3d at 1172. Good-faith communications in the process are key. *Id.*

The facts, when viewed in the light most favorable to Donahue, were sufficient to trigger UPS's duty to initiate the interactive process. Donahue asked for time to re-acclimate to his job as a trainee and to get back into shape following his injuries and lengthy absence. Doc. 64-1 at 32–33. His request for additional time to return to work could constitute a reasonable accommodation. *See Robert*, 691 F.3d at 1218. That is enough to at least raise a dispute for a jury to decide whether he engaged in the interactive process to seek an accommodation. *See Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1189 (10th Cir. 2016) (finding plaintiff created a question of fact as to whether he sought a reasonable accommodation even though he did not use "the magic words 'reasonable accommodation'").

UPS also contends that Donahue's requested accommodation was unreasonable and that the two options that he rejected were sufficient to discharge its obligation. Doc. 64 at 19. Again, there is a question of fact about whether the accommodations sought and offered were reasonable under the circumstances. UPS says that the applicable collective bargaining agreement limited it to the two options offered. Doc.

68 at 59. It also argues that the option Donahue requested would have violated that agreement. *Id.* But the evidence Donahue has adduced suggests that this was not required by the agreement nor enforced every time. It is possible, then, for a reasonable jury to conclude that UPS did not meaningfully consider Donahue's requested accommodation. Thus, there exists a genuine dispute as to whether Donahue engaged as required in the accommodation-request process and whether UPS did the same.

## C

In Count V, Donahue contends that he suffered discrimination and retaliation on the basis of his race in violation of 42 U.S.C. § 1981.[3] Doc. 62 at ¶ 4.a.5. The aforementioned *McDonnell Douglas* burden-shifting test applies to both of Donahue's claims.

Only the elements of the prima facie case are relevant based on UPS's limited summary judgment argument. With regard to the prima facie elements of a race-based discrimination claim, the plaintiff is required to establish that he is a member of a protected class, that he was subject to an adverse employment action, and that there was disparate treatment among similarly situated employees. *See Payan v. United Parcel Serv.*, 905 F.3d 1162, 1168 (10th Cir. 2018). For a retaliation claim, the prima facie case requires proof that the plaintiff engaged in protected activity, suffered a materially adverse action, and that there was a causal connection between the protected activity and the adverse

---

[3] While the Complaint included a claim for hostile work environment, Doc. 1 at ¶ 104.c., Donahue dropped that claim at the pretrial stage, Doc. 62 at ¶ 4.a.5. That omission constitutes a waiver. *See* Fed. R. Civ. P. 16(d); *Leathers v. Leathers*, 856 F.3d 729, 760 (10th Cir. 2017). Even if Donahue had preserved this claim, it would have failed because the only evidence that Donahue cites is a single statement of alleged racial animus. Doc. 67 at 77. A single statement, without more, is insufficient to create a question of fact about whether the entire workplace was so permeated with discriminatory animus, intimidation, and the like to be considered a sufficiently severe or pervasive alteration of Donahue's conditions of employment. *See, e.g., Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998) (concluding two incidents over two years are insufficient for establishing a racially hostile work environment); *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) ("Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."); *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1175 (10th Cir. 1996).

employment action. *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015); *see also Ward v. Jewell*, 772 F.3d 1199, 1202 (10th Cir. 2014).

**1.** UPS argues that Donahue's disparate treatment claim fails because there is no evidence that he was treated differently than similarly situated employees. Doc. 64 at 12–13. In response, Donahue identifies only one person, Fisher, who was treated differently for failing to deliver all his packages due to a hand injury. Doc. 67 at 78. Specifically, Donahue contends that Fisher violated an honesty and integrity policy of UPS by turfing packages but was not terminated.[4] *Id.* But according to UPS, that will not do because Donahue and Fisher were not similarly situated.

The key to disparate treatment claims is demonstrating that the plaintiff "was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007). "Individuals are considered similarly-situated when they (1) have dealt with the same supervisor; (2) were subjected to the same work standards; and (3) had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct of the employer's treatment of them for it." *Fisher v. Basehor-Linwood Unified Sch. Dist. No. 48*, 460 F. Supp. 3d 1167, 1200 (D. Kan. 2020) (quoting *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1276 (10th Cir. 2005)); *see also Aramburu*, 112 F.3d at 1404 (holding that if employees "deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline" then they are similarly situated) (citations omitted).

Donahue's discrimination claim fails because Fisher is not a similarly situated employee. At the time of the incident that Donahue identifies, Fisher was already a full-time supervisor—an employee, in a managerial position no less, whose length of service provided him rights under the collective bargaining agreement. Doc. 68 at ¶¶ 51, 174–77. Donahue, in contrast, was an at-will trainee without the

---

[4] UPS briefly alleges that Donahue has not identified any adverse employment action. Doc. 64 at 12, 16. But as noted, Donahue claims that he was terminated for turfing a package when Fisher was not. Termination is sufficient to satisfy the adverse employment obligation. *See Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 738 (10th Cir. 2014).

collective bargaining agreement. Furthermore, Fisher and Donahue had different supervisors, were subject to different standards, and the "relevant employment circumstances, such as work history and company policies," were different for the two. *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006). As such, Fisher is not a comparable employee, and Donahue has not demonstrated that he was treated differently from a similarly situated employee.

Donahue argues that he is the only trainee whom Fisher ever terminated for integrity issues like turfing packages, Doc. 67 at 67, and that UPS has not identified any other probationary employee that it terminated for turfing packages, *id.* at 38. Even accepting that as true, Donahue bears the burden to make a prima facie case, and his summary judgment papers have not identified any other probationary employee who engaged in the same conduct, much less one who had the same supervisor, same surrounding circumstances, but different race. In short, Donahue has not identified any facts to show that his termination was attributable to or motivated by his race. Thus, UPS's motion for summary judgment is granted as to this claim. *See McGowan*, 472 F.3d at 745; *Green v. New Mexico*, 420 F.3d 1189, 1194–95 (10th Cir. 2005); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230–31 (10th Cir. 2000).

**2.** UPS also argues that Donahue's race-based retaliation claim fails because Donahue has provided no evidence that he engaged in any related protected activity that could be causally tied to his termination. Doc. 64 at 15–16. Donahue does not contest that point or identify any relevant conduct that preceded his alleged termination. As a result, UPS has established that there is no genuine dispute of material fact on this point and, as a result, that it is entitled to judgment as a matter of law.

The only response that Donahue offers in opposition is a statement that he contends Fisher made when informing him that he was being fired. Specifically, Donahue alleges that while he and Fisher were engaging in a debate about what motivated Donahue to return to the facility with undelivered packages, Fisher allegedly said that he did not know why "you people do what you do." Doc. 67 at ¶ 79. But as Donahue noted, that is not how another witness to the conversation recalled the statement: Burger, who was the union representative, recalled Fisher's comment to suggest only that Fisher had no idea why people, generally, do what they do. Doc. 67 at ¶ 79.

16

Yet even accepting Donahue's interpretation of the conversation, Fisher's statement does not suggest that Donahue engaged in any protected conduct. He merely heard Fisher make a statement that he believed was racially motivated. Moreover, Fisher made his statement *after* he had made the decision to terminate Donahue and while he was explaining his termination decision. Retaliation claims exist to prohibit adverse employment actions taken because an employee previously engaged in protected conduct. *Singh v. Cordle*, 936 F.3d 1022, 1043 (10th Cir. 2019). The timing disconnect is fatal to Donahue's claim. *See, e.g.*, *Thompson v. Little Am. Hotel Co.*, No. 20-466, 2022 WL 62438, at *5 (D. Utah Jan. 6, 2022) (finding that plaintiff's complaint during the termination discussion "cannot support a claim for retaliation since the alleged protected activity occurred after the adverse action and does not meet the appropriate causation standard."). Consequently, UPS's motion is granted as to Donahue's Section 1981 claims.

### III

For the foregoing reasons, UPS's Motion for Summary Judgment is GRANTED in part and DENIED in part.

It is so ordered.

Date: January 27, 2022       _s/ Toby Crouse_____
                             Toby Crouse
                             United States District Judge

17